**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

LARRY WAYNE MORRISON,           )
                                )
                Plaintiff,      )
                                )
        v.                      )          1:19CV413
                                )
ANDREW M. SAUL,                 )
Commissioner of Social Security,[1]  )
                                )
                Defendant.      )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Larry Wayne Morrison, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 8, 10; see also Docket Entry 9 (Plaintiff's Brief); Docket Entry 11 (Defendant's Memorandum); Docket Entry 12 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, alleging a disability onset date of December 1, 2012.  (Tr. 243-44, 245-50.)  Upon denial of those applications initially (Tr. 69-95, 132-39) and on reconsideration (Tr. 96-131, 142-51), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 154-55).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 35-68.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 21-29.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-8, 242, 353-54), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1.  [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2015.
>
> 2.  [Plaintiff] has not engaged in substantial gainful activity since December 1, 2012, the alleged onset date.
>
> . . .
>
> 3.  [Plaintiff] has the following severe impairments: back, left leg and left ankle arthralgias, status post fracture; depression; anxiety, and borderline intellectual functioning.
>
> . . .
>
> 4.  [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

2

. . .

5.   . . . [Plaintiff] has the residual functional
capacity to perform a range of medium work . . . .
Specifically, he may frequently climb ramps and stairs.
He may frequently kneel, crawl, crouch, and stoop.  He
may frequently balance.  He may occasionally climb ropes,
ladders or scaffolds.  He requires simple, routine,
repetitive tasks with no contact with the public,
occasional contact with coworkers and supervisors,
routine changes, non-production oriented, and work
learned by demonstration.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the . . . Act, from December 1, 2012, through
the date of this decision.

(Tr. 17-29 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits."  <u>Hines v.
Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited."  <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).

3

Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence

4

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's]

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u>

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." <u>Hunter</u>, 993 F.2d at 35 (internal citations omitted).

6

is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ("RFC")." Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

---

[4]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5]  A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process,
(continued...)

### B. Assignment of Error

In Plaintiff's first and only assignment of error, he asserts that "[t]he ALJ committed a reversible error of law at step three of [the SEP] by failing to explain why the evidence of record does not establish that [Plaintiff] meets [L]isting 12.05B for intellectual disorder." (Docket Entry 9 at 3 (bold font and single-spacing omitted); see also Docket Entry 12 at 1.) In particular, Plaintiff maintains that "[t]he record contains significant probative evidence indicating that [he] meets the criteria of [L]isting 12.05B" (Docket Entry 9 at 4 (bold font and single-spacing omitted)), but that, "at step three of [the SEP], the ALJ found only that '[t]he severity of [Plaintiff]'s mental impairments, considered singly and in combination, d[id] not meet or medically equal the criteria of [L]istings 12.04, 12.06, and 12.11'" (id. at 5 (quoting Tr. 19)). According to Plaintiff, the United States Court of Appeals for the Fourth Circuit "held that remand was required where there was 'probative evidence strongly suggesting that['] the claimant met a listing and the ALJ's failure to adequately explain the reasoning for finding that a claimant failed to meet the listing rendered that finding 'devoid of reasoning' and precluded the courts from 'undertaking a meaningful review of the finding.'" (Id. at 8 (quoting Radford v. Colvin, 734

---

[5] (...continued)
review does not proceed to the next step.").

8

F.3d 288, 295-96 (4th Cir. 2013)) (certain internal quotation marks omitted); see also Docket Entry 12 at 2.)  Those contentions ultimately fail to warrant relief.

"Under Step 3, the [SEP] regulation states that a claimant will be found disabled if he or she has an impairment that 'meets or equals one of [the] listings in [A]ppendix 1 of [20 C.F.R. Pt. 404, Subpt. P] and meets the duration requirement.'" Radford, 734 F.3d at 293 (quoting 20 C.F.R. § 404.1520(a)(4)(iii)) (internal bracketed numbers omitted).  "The listings set out at 20 CFR [P]t. 404, [S]ubpt. P, App['x] 1, are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (internal footnote and parentheticals omitted).  "In order to satisfy a listing and qualify for benefits, a person must meet all of the medical criteria in a particular listing." Bennett, 917 F.2d at 160 (citing Zebley, 493 U.S. at 530, and 20 C.F.R. § 404.1526(a)); see also Zebley, 493 U.S. at 530 ("An impairment that manifests only some of th[e] criteria [in a listing], no matter how severely, does not qualify.").

An ALJ must identify the relevant listed impairments and compare them to a claimant's symptoms only where "there is ample evidence in the record to support a determination that [the

9

claimant's impairment] met or equalled [sic] one of the [ ] impairments listed in Appendix 1 . . . ." Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986) (emphasis added); see also Russell v. Chater, No. 94-2371, 60 F.3d 824 (table), 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished) ("Cook . . . does not establish an inflexible rule requiring an exhaustive point-by-point discussion [of listings] in all cases."); Ollice v. Colvin, No. 1:15CV927, 2016 WL 7046807, at *3 (M.D.N.C. Dec. 2, 2016) (unpublished) (Peake, M.J.) ("[A]n ALJ is not required to explicitly identify and discuss every possible listing; however, he must provide sufficient explanation and analysis to allow meaningful judicial review of his step three determination where the 'medical record includes a fair amount of evidence' that a claimant's impairment meets a disability listing." (emphasis added) (quoting Radford, 734 F.3d at 295)), recommendation adopted, slip op. (M.D.N.C. Jan. 10, 2017) (Osteen, Jr., J.).

In order to meet the requirements of Listing 12.05B, a claimant must demonstrate 1) "[s]ignificantly subaverage general intellectual functioning evidenced by . . . [a] full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence," 2) "[s]ignificant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: [u]nderstand, remember, or apply

10

information; or [i]nteract with others; or [c]oncentrate, persist, or maintain pace; or [a]dapt or manage oneself," and 3) "that the [intellectual] disorder began prior to [the claimant's] attainment of age 22." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05B (2017) (subsection lettering and internal citations omitted).

Here, as Plaintiff points out (see Docket Entry 9 at 5; see also Docket Entry 12 at 2), the ALJ opted to analyze Plaintiff's intellectual deficits under Listing 12.11 for "Neurodevelopmental [D]isorders" (which includes borderline intellectual functioning, see 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00B.9.b), rather than Listing 12.05B for "Intellectual [D]isorder" (see Tr. 19).[6] As relevant to Plaintiff's intellectual functioning, Listing 12.11 requires 1) "[m]edical documentation of . . . significant difficulties learning and using academic skills," and 2) [e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning: [u]nderstand, remember, or apply information[; i]nteract with others[; c]oncentrate, persist, or maintain pace[; a]dapt or manage oneself." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.11 (subsection lettering and internal citations omitted).

---

[6] The ALJ also analyzed whether Plaintiff's depression met or equaled the criteria of Listing 12.04 for "Depressive, [B]ipolar, and [R]elated [D]isorders" and whether Plaintiff's anxiety met or equaled the criteria of Listing 12.06 for "Anxiety and [O]bsessive-[C]ompulsive [D]isorders." (See Tr. 19-20.) Although Plaintiff did not raise any arguments directed at the ALJ's analysis under Listings 12.04 and 12.06 (see Docket Entry 9), all three Listings in question contain the same paragraph B criteria, compare 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04B, with id., § 12.06B, and id., § 12.11B, and, accordingly, the ALJ provided only one analysis of those criteria (see Tr. 19-20).

The ALJ apparently assumed without expressly deciding that
Plaintiff's intellectual deficits met the criteria of paragraph A
of Listing 12.11 (see Tr. 19), and then provided the following
rationale (which formed part of the ALJ's analysis supporting her
finding that Plaintiff's intellectual deficits did not satisfy
Listing 12.11's paragraph B criteria) for disregarding three of
Plaintiff's IQ scores in the 60's obtained at a consultative
psychological examination by Dr. Renee C. Hinson in August 2015:

> School records indicate his IQ was a 76 in 1985 and an 88
> in 1982 and that he was reading on a 6th grade level when
> he was in 8th grade. Although [Dr. Hinson] noted IQ
> scores in the 60's, the [ALJ] does not find that this is
> consistent with his school records. There is no reason
> that his IQ would drop almost 10 points since he was in
> school. His last recorded IQ was 82 when he was in
> school, which is in the borderline range.

(Tr. 19 (emphasis added) (internal parenthetical citations
omitted); see also Tr. 284, 379-80.)

Plaintiff takes issue with the ALJ's rejection, emphasized
above, of Plaintiff's IQ scores in the 60's from Dr. Hinson's
examination, in favor of Plaintiff's higher IQ scores reflected in
his school records, which fell in the borderline intellectual
functioning range. (See Docket Entry 9 at 6-7; see also Docket
Entry 12 at 3.) More specifically, Plaintiff acknowledges that his
school records reflect that he obtained a Language IQ of 88, a Non-
Language IQ of 79, and a Total IQ of 81 on the Short Form Test for
Academic Aptitude - Level 1 ("STFAA-1") in October 1982 (aged 8)
and a Language IQ of 76, a Non-Language IQ of 91, and a Total IQ of

82 on the STFAA - Level 3 ("STFAA-3") in October 1985 (aged 11) (see id. at 6 (citing Tr. 284)), but argues that "no information [exists] in [Plaintiff]'s school records to establish whether the IQ tests cited in those records meet contemporary psychometric standards for validity, reliability, normative data, or scope of measurement[, or] . . . whether the IQ tests were administered by a qualified specialist" (id. at 7 (citing Tr. 284, as well as 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00H.2.b.); see also Docket Entry 12 at 3). Plaintiff thus argues that "the only IQ test results in the administrative record that do meet the regulatory usability standards for application of [L]isting 12.05B are the current IQ test results contained in [Dr. Hinson's] consultative examination report" (id. (citing Tr. 379-80)), and that "[t]he ALJ had no valid basis for finding that [Plaintiff]'s current full scale IQ score of 67 is inconsistent with earlier IQ scores recorded in the school records" (id.).

The ALJ erred by rejecting Plaintiff's Working Memory IQ score of 69, Processing Speed IQ score of 62, and Full Scale IQ score of 67 (all reflecting "mild [intellectual] disability") on the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV") at Dr. Hinson's consultative examination. (See Tr. 19; see also Tr. 379-80.) In discrediting those IQ scores, the ALJ relied solely on Plaintiff's IQ scores on the STFAA-1 and STFAA-3 administered at ages eight and 11 (see Tr. 19 (referencing Tr. 284)); however, the

ALJ's reliance on the STFAA IQ scores constitutes legal error for two reasons.

First, the regulations explaining how the SSA "document[s] and evaluate[s] intellectual disorder under [Listing] 12.05" emphasize that the SSA "identif[ies] significantly subaverage general intellectual functioning by an IQ score(s) on an <u>individually administered</u> standardized test of general intelligence that meets program requirements and has a <u>mean of 100</u> and a <u>standard deviation of 15</u>." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00H.2.a (emphasis added); <u>see also</u> American Psychiatric Ass'n, <u>Diagnostic & Statistical Manual of Mental Disorders</u> 46 (4th ed. text rev. 2007) ("<u>Individualized</u> testing is always required to make the diagnosis of [m]ental [r]etardation." (emphasis added)). An intelligence test meets program requirements when it "meets contemporary psychometric standards for validity, reliability, normative data, and scope of measurement." <u>Id.</u>, § 12.00H.2.b. Moreover, a "<u>qualified specialist</u>" (defined as an individual "currently licensed or certified at the independent level of practice in the [s]tate where the test was performed, [who] has the training and experience to administer, score, and interpret intelligence tests," <u>see id.</u>, § 12.00H.2.c) "must administer the standardized intelligence testing." <u>Id.</u>, § 12.00H.2.a (emphasis added). As Plaintiff argues, his school records do not reflect whether Plaintiff took the STFAA individually or in a group setting

14

or whether the individuals who administered the STFAA to Plaintiff constituted qualified specialists. (Docket Entry 9 at 7 (citing Tr. 284).) In addition, the school records do not elucidate whether the STFAA-1 or STFAA-3 have "a mean of 100 and a standard deviation of 15, see id., § 12.00H.2.a, or whether they meet the SSA's above-described "program requirements" regarding "validity, reliability, normative data, and scope of measurement," id., § 12.00H.2.b. (See Tr. 284.) Thus, under the regulations, Plaintiff's STFAA IQ scores did not provide a valid basis for the ALJ to disregard Plaintiff's sub-70 IQ scores from Dr. Hinson's examination.

Second, Dr. Hinson's examination report reveals no other apparent basis for rejecting the validity of Plaintiff's IQ scores on the WAIS-IV. Under the regulations, the SSA "generally presume[s] that [the] obtained IQ score(s) is an accurate reflection of [a claimant's] general intellectual functioning, unless evidence in the record suggests otherwise." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00H.2.d (emphasis added). Furthermore, "[o]nly qualified specialists, [f]ederal and [s]tate agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that [the] obtained IQ score(s) is not an accurate reflection of [a claimant's] general intellectual functioning," and "[t]h[at] conclusion must be well supported by appropriate clinical and laboratory diagnostic

15

techniques and must be based on relevant evidence in the case record." Id.[7]

In this case, the "qualified specialist" who administered the WAIS-IV to Plaintiff, Dr. Hinson, did <u>not</u> conclude that the IQ scores failed to accurately capture Plaintiff's intellectual functioning. (<u>See</u> Tr. 381.) Indeed, according to Dr. Hinson, "[n]o significant discrepancy" existed between Plaintiff's Verbal Comprehension and Perceptual Reasoning IQ scores, Plaintiff "put forth good effort on the evaluation," and the "obtained scores [we]re a valid estimate of [Plaintiff]'s current intellectual functioning." (<u>Id.</u>) Dr. Hinson further concluded that, "based on educational, vocational and functional histories, [Plaintiff]'s current intellectual functioning appeared consistent with premorbid functioning and will reflect longevity of functioning." (<u>Id.</u>) Furthermore, the examination by Dr. Hinson met all of the regulatory requirements for deriving a valid IQ score: a standardized test of general intelligence (WAIS-IV) with "a mean of 100 and a standard deviation of 15" (Tr. 379), individually

_____

[7] "[The SSA] revised the policies [regarding consideration of IQ test scores] in response to several public comments raising concern that the proposed rules about interpreting test results <u>gave too much discretion to [ALJs] who may not have the expertise of the test administrators</u>. In response to these comments, final [Section] 12.00H2d indicates that only qualified specialists, [f]ederal and [s]tate agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that an obtained IQ score is not an accurate reflection of a claimant's general intellectual functioning." ¶ 15,551C, SSA Final Rule Regarding Revised Criteria for Evaluating Mental Disorders, Soc. Sec. Rep. P 15551C (Sept. 26, 2016) (emphasis added).

administered by a qualified specialist, see 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00H.2.

Defendant argues that "both state agency psychologists . . . opined that a diagnosis of intellectual disability [wa]s not supported by the record," and "found that Plaintiff did not meet any mental listing." (Docket Entry 11 at 11 (citing Tr. 74, 103).) Defendant further points out that the initial-level consultant "reviewed the record, including Dr. Hinson's report, and explained . . . that Plaintiff's childhood scores of 81 and 82 did not support consideration of [Listing 12.05B]." (Id. at 12 (citing Tr. 74, 284).)

Although, as discussed above, the state agency psychological consultants possess the authority under the regulations to "conclude that [Plaintiff's] obtained IQ score(s) is not an accurate reflection of [his] general intellectual functioning," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00H.2.d, Defendant's argument glosses over the fact that, in rejecting Plaintiff's 2015 IQ scores, the ALJ did not specifically rely on the consultants' opinions that Plaintiff's SFTAA Total IQ scores "d[id] not support consideration of a 12.05 [L]isting" (Tr. 74, 103). (See Tr. 19 (containing no mention of state agency psychological consultants' opinions).) In fact, the ALJ did not discuss the consultants' opinions regarding Plaintiff's SFTAA IQ scores in relation to the diagnosis of intellectual disability at all in the decision

17

(see Tr. 17-29), and afforded the consultants' opinions regarding

the paragraph B criteria and mental RFC only "partial weight":

> On October 20, 2015, [the initial-level s]tate agency
> psychological consultant . . . reviewed the medical
> evidence and concluded [Plaintiff] has moderate
> restriction of activities of daily living, moderate
> difficulties of maintaining social functioning, moderate
> difficulties in maintaining concentration, persistence or
> pace, and no difficulties in adapting or managing himself
> [sic].  On December 4, 2015, [the reconsideration-level
> s]tate agency psychological consultant . . . reviewed the
> medical evidence and concluded [Plaintiff] has moderate
> restriction of activities of daily living, moderate
> difficulties of maintaining social functioning, moderate
> difficulties in maintaining concentration, persistence or
> pace, and  no episodes of decompensation.  Both
> [consultants] concluded [Plaintiff] is capable of simple,
> routine, repetitive tasks.  These findings are not
> entitled to controlling weight, but are afforded the
> weight of expert medical opinions by non-examining
> physicians in accordance with 20 CFR 404.1527(e).  The
> [ALJ] gives partial weight to these opinions because they
> are generally consistent with the updated record and oral
> testimony.  However, the [ALJ] does not agree with using
> [L]isting 12.02 to analyze [Plaintiff's] intellectual
> functioning.  There is no evidence of a neurocognitive
> disorder.  Further, the criteria for evaluating mental
> impairments has changed.

(Tr. 27 (internal parenthetical citations omitted).)  Thus,

although the ALJ here could have relied on the state agency

psychological consultants' opinions regarding Plaintiff's SFTAA IQ

scores to reject Plaintiff's 2015 scores, the ALJ did not do so,

and this Court's "[r]eview of the ALJ's ruling is limited [] by the

so-called 'Chenery Doctrine,' which prohibits courts from

considering post hoc rationalizations in defense of administrative

agency decisions." Anderson v. Colvin, No. 1:10CV671, 2014 WL

1224726, at *1 (M.D.N.C. Mar. 25, 2014) (unpublished) (Osteen, Jr.,

18

C.J.) (citing <u>Securities & Exch. Comm'n v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947)). "Under the doctrine, a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency[, and i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" <u>Id.</u> (quoting <u>Chenery</u>, 332 U.S. at 196).

Under such circumstances, the ALJ's dismissal of Plaintiff's regulatorily compliant 2015 IQ scores on the <u>sole</u> basis of Plaintiff's SFTAA IQ scores (which do not affirmatively demonstrate conformance with those regulatory criteria) fails to comply with Section 12.00H.2.d. <u>See Leftwich v. Colvin</u>, No. 1:13CV414, 2016 WL 126753, at *5 (M.D.N.C. Jan. 11, 2016) (unpublished) (holding, under prior version of Section 12.00 governing Mental Disorders, that ALJ erred by rejecting regulatorily compliant IQ score of 70 on WAIS-III from consultative psychological examination on sole basis of higher IQ score from test administered at school at age 8), <u>recommendation adopted</u>, slip op. (M.D.N.C. Feb. 2, 2016) (Schroeder, J.); <u>see also Cooke v. Colvin</u>, No. 1:17CV841, 2018 WL 3999636, at *8 (M.D.N.C. Aug. 21, 2018) (unpublished) (finding, under prior version of Section 12.00 governing Mental Disorders, that the plaintiff's total IQ scores of 67 and 70 at ages 14 and 15, respectively, on the SFTAA-4 failed to qualify as valid IQ scores under Listing 12.05, because, <u>inter alia</u>, "[t]he record []

19

contain[ed] no evidence that [the p]laintiff's middle school administered the SFTAA-4 to [the p]laintiff individually"), recommendation adopted sub nom., Cooke v. Berryhill, 2018 WL 4688318 (M.D.N.C. Sept. 28, 2018) (unpublished) (Schroeder, C.J.), aff'd, 767 F. App'x 539 (4th Cir. 2019).

Although the ALJ erred in rejecting Plaintiff's 2015 IQ scores, that error remains harmless under the circumstances presented here. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Even if the ALJ had fully credited Plaintiff's three 2015 IQ scores in the 60's (such that he met the criteria of paragraph B.1.a of Listing 12.05), remand for the ALJ to analyze Plaintiff's intellectual deficits under Listing 12.05B would not result in a different outcome. Listings 12.05B and 12.11 share the same paragraph B criteria, compare 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05B.1.a, with id., § 12.11B, and thus, even if the ALJ applied Listing 12.05B upon remand, that Listing would again require the ALJ to rate Plaintiff's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself, see id., § 12.05B.1.a.

20

The ALJ provided the following analysis of the (same) paragraph B criteria in connection with the analysis of Listing 12.11:

> In understanding, remembering, or applying information, [Plaintiff] has a moderate limitation. [Plaintiff] has provided detailed information regarding his medical condition, medications, treatment providers, dates, and the work he did in the past in multiple disability reports . . . and in his hearing testimony. Linda Goins, [Plaintiff]'s friend, described in a function report how her friend requires reminders to take medications and perform tasks and does not follow written or spoken instructions well, but he remained able to pay bills, count change, handle a savings account and use a checkbook/money orders. Consultative examiner Dr. Renee Hinson reported [Plaintiff] had the ability to understand, retain and follow simple instructions, and he would need assistance in managing funds to his own best interest. [Plaintiff] stated he could read, but had trouble with some words and he completed 8.7 years of school. He said he went to the eighth grade at a special school, but did not complete the eighth grade, turned 16 and quit. He stated he was in the sixth grade for three years and they put him at Petree Middle School in the eighth grade where he was taught through the one-on-one method. School records indicate his IQ was a 76 in 1985 and an 88 in 1982 and that he was reading on a 6th grade level when he was in 8th grade. Although [] consultative [psychological] examiner [Dr. Hinson] noted IQ scores in the 60's, the [ALJ] does not find that this is consistent with his school records. There is no reason that his IQ would drop almost 10 points since he was in school. His last recorded IQ was 82 when he was in school, which is in the borderline range.
>
> In interacting with others, [Plaintiff] has a moderate limitation. Ms. Goins described her friend as having no difficulties getting along with friends, family members, former coworkers/supervisors, or authority figures. She noted he talks with family daily, talks with her regularly, and rides in a car with his brother. Consultative examiner Dr. Hinson reported [Plaintiff] exhibited good interpersonal behavior yet may have difficulty with peers, coworkers and supervisors due to poor coping skills, poor social skills and symptoms of

21

anxiety and depression. She noted he is capable of conforming to social standards and complying with rules and regulations and given his history, appears capable of cooperating with authority figures. [Plaintiff] stated he does not like being around people that he does not know, as it depresses him. He also stated he lives with someone.

With regard to concentrating, persisting, or maintaining pace, [Plaintiff] has a moderate limitation. [Plaintiff] has complained of pain during visits with his treatment providers. Mr. [sic] Goins described that her friend can pay attention about 10-15 minutes and he has no hobbies. Consultative examiner Dr. Hinson indicated that [Plaintiff] had difficulty reading or writing a simple sentence or performing simple calculations, had difficulty sustaining attention to perform simple repetitive tasks, and exhibited adequate concentration, persistence and pace during the evaluation. [Plaintiff] reported that he has a driver's license and drives. [Plaintiff] stated he does not watch television, do puzzles or board games and passes the time by looking at his phone and taking walks as much as he can.

As for adapting or managing oneself, [Plaintiff] has experienced a mild limitation. Ms. Goins described her friend as having difficulties dealing with stress or changes to his routine. Consultative examiner Dr. Hinson indicated that [Plaintiff] reported the ability to tolerate stress and pressures associated with day-to-day work activity. Treatment notes from his treatment providers do not contain any issues with his grooming or conflicts with medical staff.

Because [Plaintiff]'s mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 19-20 (emphasis added) (internal parenthetical citations omitted).)

Significantly, Plaintiff has not raised any arguments specifically attacking the ALJ's paragraph B criteria findings that Plaintiff had less-than-listing-level limitations in all four areas

of mental functioning (see Docket Entry 9), and instead contends that, "[i]n rating the degree of limitation in the four areas of mental functioning, the ALJ did not consider the impact of [Plaintiff]'s current full scale IQ score of 67, an IQ score that the ALJ had no evidentiary basis to discount" (Docket Entry 12 at 3). Notwithstanding the ALJ's error with regard to the 2015 IQ scores, the ALJ's thorough discussion regarding the paragraph B criteria, quoted above, provides substantial evidence to support her findings in each area. (See Tr. 19-20.)

In short, Plaintiff's sole assignment of error fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security (Docket Entry 8) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 10) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 31, 2020

23